# STATE OF WEST VIRGINIA

## SUPREME COURT OF APPEALS

**CATHERINE BELCHER,**
**Claimant Below, Petitioner**

**FILED**

December 11, 2020
**EDYTHE NASH GAISER**, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs.)    No. 19-1035** (BOR Appeal No. 2054262)
         (Claim No. 2018016457)

**UNITED TECHNOLOGIES CORPORATION,**
**Employer Below, Respondent**

## MEMORANDUM DECISION

Petitioner Catherine Belcher, by Counsel Patrick K. Maroney, appeals the decision of the West Virginia Workers' Compensation Board of Review ("Board of Review"). United Technologies Corporation, by Counsel James W. Heslep, filed a timely response.

The issue on appeal is compensability of the claim. On July 17, 2018, the claims administrator rejected Ms. Belcher's claim. The Workers' Compensation Office of Judges ("Office of Judges") affirmed the claims administrator's rejection of the claim in an Order dated May 2, 2019. This appeal arises from the Board of Review's Order dated October 18, 2019, in which the Board of Review affirmed the decision of the Office of Judges.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

Ms. Belcher is a retired quality assurance worker at United Technologies Corporation's production facility in Union, West Virginia. Ms. Belcher submitted an Employee Notification of Industrial Hygiene Sampling-Monitoring dated February 28, 2017. Samples taken in the report were taken on February 28, 2017, for cadmium and lead. The cadmium result was less than 0.00018 mg/m3. The OSHA permissible exposure limit ("PEL") was 0.005 mg/m3, and the ACGIH threshold limit value ("TLV") is 0.01 mg.m3. For lead, the result was less than 0.00046 and the PEL was 0.05 and the TLV was 0.05. The reports stated that the sample results were below detection limit and it was recommended that wearing appropriate personal protective equipment ("PPE") should continue. The PPE were safety glasses, safety toe shoes, and nitrile gloves.

1

A LabCorp of America report dated May 22, 2017, as part of Ms. Belcher's patient chart from Monroe County Health Center dated May 24, 2017, showed blood collected from Ms. Belcher on May 17, 2017, was tested for cadmium and none was detected. The OSHA cadmium standard is 5.0 and the detection limit is 0.5. There was also a sample testing of the lead level in her blood and the result was 1 UG/DL. The report indicated that the environmental exposure WHO recommendation is less than 20 and the OSHA exposure for lead is 40 and the BEI is 30. The detection limit is 1 UG/DL.

Ms. Belcher filed an Employees' and Physicians' Report of Occupational Injury or Disease form on September 22, 2017. She was last exposed to any occupational hazards on May 17, 2018. Ms. Belcher stated that her occupational disease claim is based upon her exposure to lead at work. The physician's section was completed by Erica Dowdy, PA-C, who described the occupational disease as lead exposure.

By Order dated July 17, 2018, the claims administrator denied Ms. Belcher's application for benefits on the basis that her medical provider had not submitted documentation in support of her application for benefits. Ms. Belcher protested the claims administrator's Order.

In a report from James Bailey III, M.D., from Endocrinology Associates, Inc., dated May 15, 2018, Dr. Bailey noted that Ms. Belcher was treating with him for diabetes. Ms. Belcher was diagnosed with diabetes in 2006 and her medical history was notable for hypertension and hyperlipidemia. Dr. Bailey assessed diabetes mellitus type 2, uncontrolled; hypertension; hypothyroidism, acquired; gastroesophageal reflux disease; obesity; nontoxic multinodular goiter; and Cushing's syndrome.

In response to Interrogatories dated September 21, 2018, Ms. Belcher indicated that she worked for the respondent from May 8, 1995, to January 31, 2018. She worked in two different positions, including positions in quality assurance and final finishing. She also indicated that she smoked cigarettes for ten years at the rate of one pack per week until she quit smoking in 1986. She was deposed on October 11, 2018, and she testified that in her previous job she was not exposed to any type of chemicals or test. However, in one of her jobs as a composite builder, she was exposed to acetone and a potting compound every day. In another position, she used a dust mask, jacket and gloves because sanding was performed. She was exposed to dust while working in the cutting room. She testified that around 2000 the two departments were merged, and she went back to building process. Although the potting compound was no longer used, she was still exposed to fumes for about two hours per day while working in this department. Later, she worked in the element room where she was exposed to the fumes from the soldering process. After working the element room for five or six years, she worked in lab where she was exposed to chemicals and dust or fumes. During work, Ms. Belcher testified that she was exposed to fumes, chemicals, and compounds, such as potting compound, acetone, and resin. She then worked as a final finish builder where she was exposed to chemicals, fumes, and dust. After that, Ms. Belcher went to work in the quality assurance department and was exposed to particles and fumes on a daily basis.

Ms. Belcher testified that she filed her workers' compensation claim after the company asked her to wear a monitor for an eight-hour day while she was working. The monitor was an air sampling device. After the sampling results were in, she was told that everything was fine and that the numbers were low. She went to her doctor at the Monroe County Health Clinic after she had received the results. It was her understanding that there was lead in her blood in the safe limit. She said that outside of work she would not have been exposed to lead. She further testified that ceiling testing was performed at the plant and the company met with employees to discuss the results of those tests. It was her understanding that the testing revealed areas of issues with lead, cadmium, and other substances. Ms. Belcher indicated that she worked in an area that had issues with lead and cadmium. Although she was born with two kidneys, it was later determined that she had a deformed kidney and that both kidneys were connected with the left side. The non-functioning kidney was removed in 1985. Ms. Belcher related her kidney condition to her exposure to lead and other substances at the company.

On October 3, 2018, the respondent submitted an Adult Exposure to Lead Fact Sheet regarding exposure to lead from the State of Michigan. This study is based upon common work exposure in Michigan due to lead paint and manufacture of brass and bronze fixtures and recycling of lead batteries, and as an instructor or doing maintenance in a firing range. The fact sheet lists health effects of lead in an adult.

On November 13, 2018, Ms. Belcher offered portions of reports from REI Consultants dated February 9, 2017. The cover letter indicates that the sampling was performed by B. F. Goodrich in Union, West Virginia. The submission contains portions of two reports and an analytical report addressing sampling for hexavalent chromium, as well as other metals and associated readings.

On May 2, 2019, the Office of Judges issued a final decision affirming the July 17, 2018, rejection of the claim by the claims administrator. The Office of Judges determined that Ms. Belcher had not proven that she suffers from an occupational disease attributable to lead exposure from working for the respondent. It was found that lead exposure is not a compensable disease. Instead, the Office of Judges found that lead exposure is simply, exposure to a substance. Ms. Belcher failed to establish that she actually suffers from an occupational disease, and the fear of contracting a disease in the future is insufficient to maintain a compensable claim under workers' compensation. Accordingly, the July 17, 2018, claims administrator decision rejecting Ms. Belcher's claim was affirmed. In an Order dated October 18, 2019, the Board of Review adopted the conclusions of law and findings of fact of the Office of Judges and affirmed its decision.

After review, we agree with the decision of the Office of Judges, as affirmed by the Board of Review. The Office of Judges found that Ms. Belcher has not proven that she suffers from an occupational disease attributable to lead exposure from working for United Technologies Corporation in order to maintain a workers' compensation claim. Ms. Belcher's alleged exposure does not satisfy the six criteria of an occupational disease found in West Virginia Code § 23-4-

1(f).[1] Ms. Belcher argues that she suffered an injury from her alleged exposure to lead at work without a medical opinion that she has developed any symptom or contracted any disease process as a result of such exposure.

For the foregoing reasons, we find that the decision of the Board of Review is not in clear violation of any constitutional or statutory provision, nor is it clearly the result of erroneous conclusions of law, nor is it based upon a material misstatement or mischaracterization of the evidentiary record. Therefore, the decision of the Board of Review is affirmed.

Affirmed.

**ISSUED: December 11, 2020**

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

---

1 West Virginia Code § 23-4-1(f) (2018) defines workers' compensation coverage for occupational disease. The section provides six criteria for the coverage of an occupational disease: (1) That there is a direct causal connection between the conditions under which work is performed and the occupational disease; (2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment; (3) that it can be fairly traced to the employment as the proximate cause; (4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment; (5) that it is incidental to the character of the business and not independent of the relation of employer and employee; and (6) that it appears to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

4